[Crim. No. 4323. In Bank.—February 18, 1941.]

THE PEOPLE, Respondent, v. JOHN REED, Appellant.

Charles D. Warner and Albert D. Trujillo for Appellant.

Earl Warren, Attorney-General, and Frank Richards, Deputy Attorney-General, for Respondent.

THE COURT.—John Reed and John Thurman were convicted of murder in the first degree. The jury recommended life imprisonment for Thurman; Reed was sentenced to die. They appeal from the judgment and the order denying their motions for a new trial.

The evidence establishes the following facts: George Stephenson, the deceased, lived alone in a cabin on the edge of the Colorado River near the little settlement of Crossroads, located in the southeast corner of San Bernardino County. He was sixty-nine years of age and received old age pension checks monthly in the amount of $40. From these payments he had saved about $300 or $350 which he carried on his person in a billfold. When making purchases at the stores in Crossroads, it was not unusual for him to exhibit his savings and to exchange small bills for ones of larger denomination.

Down the dirt road about 150 feet from Stephenson's cabin was another cabin occupied by Henry Williams, an elderly negro. On the evening of Friday, March 15, 1940, Stephenson visited Williams for about a quarter of an hour. Shortly after Stephenson left to return to his own cabin, Williams heard him call in an unusually loud voice, "What does all this mean? What is this all about?" Then all was quiet. Williams became uneasy and after a few minutes seized an ice pick and started for the Stephenson cabin. As he was proceeding along the dirt road which skirted the dense arrow weeds separating the two cabins, he saw two men come running from the direction of Stephenson's cabin. One man came within eight or ten feet of him. This man he later identified as Reed. The other man appeared tall and thin, but was not otherwise clearly visible. Williams then proceeded to the cabin, but finding no one there, hastened to a nearby gas station and persuaded the proprietor to drive back with him. The latter found Stephenson a few yards beyond the cabin, lying just at the brink of the river bed, bound and gagged, with his head badly beaten. He died a few hours later at the hospital. Upon search of his body and premises neither his billfold nor his money could be found.

For several months before the commission of the crime John Reed had lived in the vicinity of Crossroads and patronized the same stores in Crossroads as the deceased. One week before the commission of the crime he secured a ride from Phoenix, where he had been working, to Parker, a town in Arizona not far from Crossroads, with a friend named Cox. At this time Reed had little or no money. He stayed in a cabin with Cox and another man named West, paying nothing

for accommodations. Three days before the commission of the crime, he met John Thurman, whom he had known for several years in Parker, and who was now out of work and without funds. The day before the crime Reed and Thurman visited Crossroads in the company of a man named Young. At that time Reed had a gun in his possession. On the day of the homicide he went to Crossroads with a man named Jack Hollis. At that time he wore a leather jacket and had a bundle under his arm. Thurman was seen in Crossroads the same afternoon. About 5 o'clock in the afternoon, shortly before the homicide was committed, Thurman was seen by two men who were acquainted with him walking in the direction of the deceased's cabin in the company of a man carrying a bundle under his arm.

That night Reed exhibited a roll of bills to West, saying he had gotten them from an Indian to purchase liquor, and offered to pay West $25 for a ride to Phoenix or Wickenburg. West at first refused, having learned from Cox that Reed and Thurman were under suspicion with regard to the homicide, but several days later West drove Reed to Phoenix and received $25. While in Phoenix, Reed, accompanied by a Mrs. Scott with whom he was acquainted, purchased a suit of clothes and a used car. He was then picked up by two police officers. A wallet containing $113 was found in his car. His suitcase containing a leather jacket and other articles of clothing was found. The clothing was turned over to a chemist who found blood stains on the sleeve of the jacket and a shirt. Upon being questioned about the money Reed gave contradictory stories—that he got it from Mrs. Scott; that he earned it selling whiskey; that he earned it selling stolen goods; that he got it from an Indian to purchase liquor.

Thurman left Parker several days after the homicide and went to Wickenburg by train, and from there to Phoenix by train. Then he bought a ticket to Herford, Texas, but returned it and went to Fresno, California, by bus and thereafter by bus to Van Nuys where he was arrested. He had spent about $47 on his trip and had $6 at the time of his arrest.

At the preliminary examination Henry Williams testified as to the circumstances surrounding the homicide and identified Reed as one of the men whom he had seen running from

the deceased's cabin. Shortly thereafter Williams disappeared. His clothes were found on the bank of the Colorado River near Crossroads, and his body was recovered from the river in an identifiable condition. At the trial the testimony given by him at the preliminary hearing was read into the record.

The foregoing facts constitute evidence which, even though circumstantial, is substantial enough to have established the guilt of the two defendants in the minds of the jury.

■ Defendants contend that the district attorney was guilty of prejudicial misconduct at the trial in questioning Reed as to whether or not he had been previously convicted of a felony. On cross-examination Reed was asked whether or not he had been convicted of stealing government property and sentenced under that conviction. The court permitted the question over objection by counsel for the defendants, and Reed answered "no". At the conclusion of the testimony in the case the district attorney stated that when he had asked the question regarding a prior conviction, he had asked it in good faith, expecting to be able to prove the conviction by documentary evidence, but that such evidence was not available, and he therefore requested that the matter be expunged from the record and the jury instructed to disregard the question. The court complied with the request. In view of this subsequent statement by the district attorney, the expunging of the matter from the record by the court in compliance with the district attorney's request, and the absence of any evidence of bad faith on the part of the district attorney, there is no prejudicial misconduct requiring a reversal. (*People* v. *Braun*, 14 Cal. (2d) 1 [92 Pac. (2d) 402].)

The judgment and order of the trial court are affirmed.